# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Fidelity and Deposit Company of Maryland,

    Plaintiff

v.

Travelers Casualty and Surety Company of America, et al.,

    Defendants

And all related matters.

Case No.: 2:13-cv-00380-JAD-GWF

**Order Granting in Part & Denying in Part Travelers's Motion for Partial Summary Judgment; Denying Fidelity's Motion for Partial Summary Judgment on Reimbursement-Related Damages & Final Motion for Partial Summary Judgment**

**[ECF Nos. 287, 327, 329]**

This surety coverage dispute involves two tiers of contracts, bonds, sureties, and principals, and the consequences that resulted when the lower-tier principal defaulted. Travelers Casualty and Surety Company of America issued surety bonds for the prime contractor that Clark County School District (CCSD) hired to modernize the heating, ventilation, and air conditioning (HVAC) systems at five of its schools. Fidelity and Deposit Company of Maryland issued surety bonds for a subcontractor. When that subcontractor defaulted, Fidelity attempted to complete the project, but it too failed to deliver functioning systems. CCSD eventually declared the prime contractor in default, prompting Travelers to step in and successfully complete the projects, albeit several years behind schedule.

After Travelers refused to pay Fidelity for its work, Fidelity sued Travelers and the prime contractor. Meanwhile, Travelers settled a separate lawsuit with CCSD for the liquated damages that resulted from the project delays. Travelers then counterclaimed against Fidelity in this case, seeking reimbursement for the damages it paid to CCSD and its cost of completing the projects.

Fidelity and Travelers both move for partial summary judgment: Travelers seeks to establish Fidelity's liability under the subcontracts, while Fidelity advances numerous defenses

to Travelers's claims. I find that there is no genuine dispute of material fact that the original subcontractor breached its subcontracts with the prime contractor. But on the record before me, I cannot conclude that Fidelity separately breached these subcontracts after it took over performance, so I grant in part and deny in part Travelers's motion. And because I also conclude that Fidelity's defenses are without merit, I deny its two motions.

## Background

In 2010, CCSD hired Big Town Mechanical as the prime contractor for the HVAC modernization at the five schools at issue. Big Town and Travelers entered into a series of performance bonds in which Travelers (the surety) promised CCSD (as obligee) that it would complete the work on each school if Big Town (the principal) defaulted.[1] Under a General Indemnity Agreement (GAI) between Travelers and Big Town, a default would require Big Town to assign its rights under the contracts and subcontracts to Travelers.[2]

Big Town hired subcontractor F.A.S.T. Systems—a non-party in this action—to complete the low-voltage work for the five schools, which primarily included installing the HVAC automation systems.[3] In August 2010, the two companies formed subcontracts that set completion dates for FAST's work at each school.[4] These dates ranged from October 2010 to the end of December 2011. Big Town, like CCSD, also required FAST to acquire performance bonds for each school. FAST bought its bonds from Fidelity, which promised Big Town that it would complete FAST's scope of work if the subcontractor defaulted.

---

[1] ECF No. 319-1. Travelers issued performance bonds for each of the five schools, and each bond contains materially identical terms. *Id*.

[2] ECF No. 47-2.

[3] ECF No. 287 ¶ 2; *see, e.g.*, ECF 288-1 at 36–40.

[4] ECF Nos. 288-1, 288-2, 288-3, 289-1, 289-2.

This agreement was soon put to the test. By mid-November 2011, FAST was well past the deadlines for four of the schools and had not completed their installations—or had at least failed to provide functioning automated systems. Big Town therefore fired FAST from all five schools[5] and demanded that Fidelity step in as the surety under the performance bond for FAST. As I've explained in my prior orders, a surety in Fidelity's position has two options: pay for the contract damages caused by the defaulting principal—in this case FAST—or hire its own subcontractor to complete the work and thereby (ideally) minimize costs.[6] Fidelity opted for the latter avenue, hiring Perini as its subcontractor in December 2011. Perini then hired its own subcontractors and got to work.[7] The following month, Fidelity asserted to Big Town that it was entitled to the remaining subcontract funds, but Big Town responded that it would not issue any progress payments.[8] Fidelity's subcontractors nonetheless continued to work.

In May 2012, Perini informed Big Town that it had "substantially completed" all of FAST's work at the five schools and it therefore intended to leave the job sites in the next few weeks.[9] Shortly after, Perini also informed Big Town that it was commencing the one-year warranty period for its work.[10] Big Town did not object to either notice. That August, Perini submitted invoices to Big Town, but Big Town never remitted payment or otherwise responded. Fidelity consequently filed suit against Big Town and Travelers in early 2013.[11]

---

[5] ECF No. 289-7.

[6] *E.g.*, *Fid. & Deposit Co. of Maryland v. Big Town Mech., LLC*, No. 2:13-CV-00380-JAD-GWF, 2017 WL 1102725, at *1 (D. Nev. Mar. 23, 2017).

[7] None of the subcontractors that Fidelity hired is a party to this action.

[8] ECF No. 330-3 at 36–37; ECF 322-3 ¶ 8.

[9] ECF No. 330-3 at 75.

[10] ECF No. 330-2 at 83.

[11] ECF No. 1.

Around the same time, Big Town was attempting to receive its final payment from CCSD.  In May 2013, CCSD rejected that payment application, summarily asserting that the project was not yet complete.[12]  Big Town filed for bankruptcy two weeks later.  On May 22, CCSD notified Travelers that it considered Big Town in default under the prime contracts.[13]  CCSD also claimed that there were "significant defects and deficiencies in the work, including roof leaks at several schools and a general failure of HVAC control systems."[14]  In turn, CCSD "demand[ed] that Travelers immediately take action" under the performance bonds between Travelers and Big Town.[15]  The following month, CCSD filed suit against Travelers, alleging that Travelers had "refuse[d] to proceed with [its] duties" and seeking to compel specific performance.[16]  CCSD also sought to recover over $11 million in liquidated damages.[17]

While the suit was ongoing, Big Town put out a request in September 2013 for bids from subcontractors to complete the HVAC projects.[18]  In December, CCSD and Travelers formed a "takeover agreement," in which Travelers agreed to complete the unfinished work under the original contracts with Big Town.[19]  On the same day, Travelers hired Sletten Construction as its contractor,[20] and Sletten began working the following month.[21]

---

[12] ECF No. 330-5 at 44.

[13] *Id.* at 114.

[14] *Id.*

[15] *Id.* at 115.

[16] *Id.* at 138, ¶¶ 41, 45–51.

[17] *Id.* at 171.

[18] ECF No. 330-6 at 11–13.

[19] *Id.* at 18–26.

[20] *Id.* at 28–55

[21] *Id.* at 95–98.

In February 2014, Travelers wrote to Fidelity, asserting (without detail) that Fidelity had failed to complete FAST's work on each of the five schools.[22]  Travelers demanded that Fidelity resume its work.  This was the first notice that Fidelity received that its work was unsatisfactory since its subcontractors left the job sites in June 2012.  It is unclear if Fidelity ever responded.

Meanwhile, Travelers had also engaged the firm MEP Consulting to help evaluate why the automation and control systems were not functioning.  MEP issued a report critical of the HVAC building controllers that FAST had installed[23] and which CCSD had pre-approved.  Sletten eventually replaced these controllers with a different brand[24] and also replaced the wiring that FAST had installed and which (as discussed in more detail below) was later determined to be improper.[25]  Sletten completed work on the schools throughout 2014, and each school passed the commissioning process that verified its HVAC system was functional and complied with CCSD's specifications.

Travelers eventually settled CCSD's suit against it for $5 million.[26]  Through its counterclaim in this action, Travelers seeks reimbursement from Fidelity for this amount and the over $1 million that it expended to complete the HVAC projects.[27]

## Summary-judgment standard

Summary judgment is appropriate when the pleadings and admissible evidence "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

---

[22] *Id*. at 111–21.

[23] ECF No. 330-7 at 40–41.

[24] *Id*. at 101–05.

[25] ECF No. 261-1 at 14–15.

[26] ECF No. 330-5 at 3.

[27] ECF No. 319 ¶¶ 33–34.

matter of law."[28]  When considering summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.[29]  If reasonable minds could differ on material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed, and the case must then proceed to the trier of fact.[30]

If the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial."[31]  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"; it "must produce specific evidence, through affidavits or admissible discovery material, to show that" there is a sufficient evidentiary basis on which a reasonable fact finder could find in his favor.[32]

## Discussion

Each of the three pending motions for partial summary judgment addresses only Travelers's counterclaims.  Travelers's motion seeks to establish that FAST and Fidelity— through the actions taken while standing in FAST's shoes—breached the subcontracts,[33] and Fidelity's two motions raise defenses to liability.  Fidelity first contends that Big Town contributed to the delays in completing the HVAC work and that Travelers—standing in Big

---

[28] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing FED. R. CIV. P. 56(c)).

[29] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[30] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

[31] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323.

[32] *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Anderson*, 477 U.S. at 248–49.

[33] ECF No. 327.

Town's shoes—therefore cannot establish that FAST *caused* the liquated damages to accrue.[34]

Fidelity then raises a hodgepodge of other defenses, including equity and the *Spearin* doctrine.[35]

I address breach before moving to Fidelity's defenses.

I. **FAST breached the subcontracts by missing the project deadlines, but I cannot determine on summary judgment whether Fidelity also caused a subsequent breach.**

Travelers moves for a variety of rulings supporting its counterclaims against Fidelity. As a threshold matter, it seeks to establish that the subcontracts signed by FAST and Big Town governed their relationship. Travelers then aims to establish that FAST and Fidelity breached these subcontracts by (1) failing to complete the HVAC projects by their deadlines and (2) leaving the projects before completing the commissioning process. Travelers also argues that the purported failure to complete commissioning breached Fidelity's performance bond and prevented Perini's warranties from coming into effect. I address these issues in turn.

A. **The subcontracts signed on August 30, 2010, govern.**

The parties dispute which agreements govern: the five subcontracts that FAST and Big Town executed or a set of documents that are each titled "Addendum to Subcontract Agreement." Because both sets of agreements purport to be the complete and final contract between the two contractors, the answer turns on which set was signed last. I therefore turn to the sequence of events that Travelers proffers and will highlight where the dispute of fact arises.

During the summer of 2010, Big Town sent FAST five proposed subcontracts—one per school—after selecting FAST as its subcontractor under its prime contract with CCSD.[36] The

---

[34] ECF No. 287.

[35] ECF No. 329.

[36] *See* ECF No. 327 at 6.

subcontracts are materially identical but each sets a different completion date for its respective school.[37] The subcontracts explicitly incorporate the terms of the prime contract, including all of its attachments, and state that the intent of the agreement was to "result in a complete and functional system in full compliance with the Subcontract . . . ." [38] Each subcontract specifies that "[t]ime is of the essence" and notifies FAST that it would be liable to Big Town for any liquidated damages that CCSD assessed that were the result of FAST's delays.[39] The "Scope of Work" section for each subcontract states that FAST's work would "include but not be limited to" the proposal that FAST submitted in its bid for each school.[40] Each corresponding proposal varied slightly but generally specified the hardware that FAST would install.[41] All the subcontracts also contain an integration clause specifying that the agreement "supersede[d] all prior negotiations, representations, or agreements, whether written or oral . . . ."[42]

According to Travelers, FAST requested several changes to the proposed subcontracts and, rather than executing them, submitted its own proposed agreements. Each document was styled as an "addendum" but operated as a standalone agreement: "[Big Town] and FAST have agreed that this document and the Prime Contract between CCSD and [Big Town], and the Proposal submitted by FAST, and [Big Town's] acceptance of the Proposal constitutes the Parties' Subcontract Agreement."[43] Thus, under the addendums, the subcontracts that Big Town

---

[37] ECF Nos. 161-1–161-5.

[38] *E.g.*, ECF No. 161-2 at 3.

[39] *E.g.*, *id.* at 6.

[40] *E.g.*, *id.* at 13.

[41] *E.g.*, ECF No. 288-1 at 36–40.

[42] *E.g.*, ECF No. 161-2 at 11.

[43] *E.g.*, ECF No. 288-2 at 34.

drafted would not constitute any part of the agreement between itself and FAST. Big Town initially agreed to FAST's request and both parties signed the addendums, each of which had a typed date of August 20, 2010.[44]

On August 25, however, Big Town sent FAST a letter "in response to [FAST's] request for changes to the subcontract between Big Town Mechanical and FAST Systems, Inc."[45] The letter informed FAST that CCSD requires subcontractors for its projects to be bound to the prime contract between CCSD and the prime contractor and that "[t]he contract between Big Town Mechanical and FAST . . . is based entirely on the terms as detailed in the CCSD Master Contract."[46] Big Town stated that it was therefore "unable to perform any changes to the contract provisions and subsequently denies your request for sub-contract change." The following day, FAST's CEO signed the original five subcontracts.[47] Big Town then signed the same subcontracts on August 30.

Travelers contends that, because the subcontracts contained integration clauses and were the final documents signed, the addendums may not be used to interpret Big Town's—and thus Fidelity's—scope of work under the subcontracts. Travelers relies on the parol-evidence rule, which "generally bars extrinsic evidence regarding *prior* or contemporaneous agreements that are contrary to the terms of an integrated contract."[48] Fidelity challenges the factual premise of

---

[44] ECF No. 288-2 at 34; ECF No. 288-3 at 35; ECF No. 289-1 at 34; ECF No. 289-2 at 49. The year for one of the addendums was cut off and reads, "It is so agreed this 20th day of August, 201[.]" ECF No. 288-3 at 35. None of the parties, however, contends that any of the addendums were signed after 2010.

[45] *E.g.*, ECF No. 288-2 at 33.

[46] *E.g.*, *id*.

[47] *E.g.*, *id*. at 2.

[48] *Khan v. Bakhsh*, 306 P.3d 411, 413 (Nev. 2013) (emphasis added).

this argument, asserting that dates printed on the addendums (August 20, 2010) are typographical

errors and that the addendums were all signed at some point *after* the subcontracts were fully

executed on August 30.[49]  Accordingly, Fidelity is not relying on the addendums as extrinsic

evidence to interpret the subcontracts; rather, it is arguing that the addendums supersede the

subcontracts and are therefore the *only* agreements between FAST and Big Town.  The parol-

evidence rule is therefore inapposite,[50] and the order of execution must be determined.

 Fidelity's evidence that the date on the addendums is merely a typo consists almost

exclusively of the deposition testimony of Josh McConnico, FAST's former CEO.  Fidelity

argues that his testimony creates a genuine dispute of material fact about when the addendums

were signed.  Travelers counters that, while McConnico initially stated that the addendums were

signed after the subcontracts,[51] he later equivocated on this point:

> [McConnico].  . . . I don't know if this addendum was created on
> the 20th and signed on some other date, you know, beyond the
> 26th [of August 2010].  I would assume that it -- that would have
> been the case is that it would have been signed after the fact.
> Otherwise, why would [Big Town] sign it?  I don't -- I don't know,
> sir.  It's my belief it was signed after the contract, not prior to the
> contract.
>
> Q.  And you base that belief based upon what, if you don't know?
>
> A.  Just because I believe that we created it for a reason.  And, yes,
> I signed the contract with the agreement that this is being signed,
> so I don't believe that this was signed prior.  I believe it was signed
> after.  And I think that these -- that it's either signed prior or on the
> same day.  And you're right. I probably went through, and I signed
> all that stuff and initialed it with the exceptence [sic] of this
> addendum.

---

[49] ECF No. 333 at 18.

[50] *Khan*, 306 P.3d at 413–14 ("Extrinsic or oral evidence, however, is admissible . . . to establish a subsequent alteration of an agreement . . . ." (citation omitted)).

[51] ECF No. 334 at 41.

> Q.  Do you have a specific recollection of doing that, sir, as you sit here today, or are you speculating based upon what you want to believe?
>
> A.  Well, I'm speculating based on, you know, what how we were going to move forward with these projects.  And this was the way that we were going to be able to move forward with the projects.[52]

The only fact clear from this exchange is that McConnico did not recall when he signed the addendums relative to the subcontracts.  Indeed, he has never provided even an estimate of how long after August 30, 2010, the addendums were purportedly executed.  This is understandable given that McConnico testified seven years after the fact, but his speculation and assumptions are insufficient to raise a genuine dispute of material fact.

Nor am I persuaded by Fidelity's attempts to draw inferences from the documents exchanged between FAST and Big Town.  Fidelity argues that it be would odd for the addendums to be titled "Addendum to Subcontract Agreement" if they were not drafted to modify the already-executed subcontracts.  The word "addendum," however, was a misnomer regardless of when the two sets of agreements were signed; the term means "[s]omething to be added . . . to a document,"[53] but the addendums, if signed after the subcontracts, were *replacing* them as the agreements between FAST and Big Town—not *modifying* them.  Moreover, there is no insight gained from the fact that Big Town did not explicitly reference the addendums in its August 25 letters written "in response to [FAST's] request for changes to the

---

[52] *Id*. at 58–59.  Travelers also argues that the testimony itself violates the parol-evidence rule because Fidelity proffers it to contradict the dates printed on the addendums: August 20, 2010.  This argument is wide of the mark because, "in an overwhelming number of jurisdictions, parol evidence is admissible to show that the actual date of execution of a contract is different from the date stated on the contract face."  *Fram Corp. v. Davis*, 401 A.2d 1269, 1273 (R.I. 1979) (citing cases).  And it is peculiar that Travelers attempts to apply the parol-evidence rule to the addendums—agreements that it contends the subcontracts superseded.

[53] *Addendum*, BLACK'S LAW DICTIONARY (10th ed. 2014).

11

subcontract[s] . . . ."[54]  Although it is possible that Big Town was not referring directly to the addendums, Fidelity has failed to provide any alternate explanation.  I therefore find that there is no genuine dispute that the subcontracts were signed after the addendums and thus govern the contractor-subcontractor relationship between Big Town and FAST.  So, I next consider whether FAST and Fidelity breached these subcontracts.

### B.    FAST breached the subcontracts by missing the project-completion dates.

There is no dispute that FAST failed to complete the HVAC projects by the deadlines that the subcontracts set.  Indeed, by the time Big Town terminated FAST in late 2011, four of the schools were between five and fourteen months behind schedule.[55]  Travelers argues that these completion dates were never modified because FAST also failed to seek extensions of time, which were permitted under the subcontracts as FAST's "exclusive remedy" in the event of delay. [56]  In order to obtain an extension, FAST had to submit written "change requests" to Big Town.[57]  The subcontracts specify that FAST's "failure to timely request an extension shall act as a waiver of that claim."[58]

Fidelity responds that its subcontractor, Perini, did request extensions but that Big Town rejected them.[59]  It similarly contends that Big Town's project manager instructed Fidelity's and

---

[54] *E.g.*, ECF No. 288-2 at 33.

[55] *Compare* ECF No. 327 at 5 (listing the project completion dates), *with* ECF No. 289-7 (listing the termination dates).  Fidelity argues that CCSD extended the contract-completion dates to October 14, 2011.  ECF No. 333 at 29 n.146.  Travelers disagrees with this conclusion, but because FAST also failed to complete the projects by the alleged extension date, this dispute is irrelevant to the question of breach.

[56] *See, e.g.*, ECF No. 288-2 at 7.

[57] *Id*. at 8–9.

[58] *Id*. at 7 (capitalization omitted).

[59] ECF No. 333 at 30.

Perini's representatives to stop submitting the change requests.[60]  But as Travelers correctly

highlights, Perini, not FAST, made these requests and did so *after* FAST had already missed the

project deadlines.[61]  These requests are therefore irrelevant to that particular breach of the

subcontracts.

Fidelity also contends that Big Town failed to maintain a project schedule and, in turn,

made it impossible for FAST and Fidelity to complete the projects on time.  Fidelity cites to a

statement by Big Town's project manager that the project schedules were "dead" since August

2011 and its manager's refusal to provide Perini past project schedules.[62]  But this evidence

reflects only the fact that FAST was well behind schedule by late 2011; it provides no indication

that Big Town contributed to FAST's delay.  And whether Big Town was willing to provide the

outdated schedules to *Perini* says nothing about FAST's missed deadlines.

Accordingly, the undisputed evidence establishes that FAST breached the five

subcontracts by missing the project deadlines.  And because these subcontracts specified that

time was of the essence, this breach was material.[63]

### C.    I cannot conclude that Fidelity breached its duties under the subcontracts or performance bonds in relation to the commissioning process.

Travelers's remaining arguments all pertain to its assertion that Fidelity and its

subcontractors failed to finish FAST's scope of work because they left the projects without

---

[60] ECF No. 323-1 at 122 ("I suggest everyone stop the delay nonsense, finish the work and get off the job.  I can't get anymore blunt or clearer than that.").

[61] *See* ECF No. 323-1 at 73–119.

[62] ECF No. 286-3 at 7, 14.

[63] *Johnson v. Alexander*, 134 Cal. Rptr. 101, 105 (Cal. Ct. App. 1976) ("Delay in performance is a material failure only if [t]ime is of the essence, i.e., if prompt performance is, by the express language of the contract or by its very nature, a vital matter.").

completing the commissioning process. Although it is evident from the parties' arguments that "commissioning" refers to testing the HVAC systems to ensure that they function correctly, neither side has elaborated on what this process entails. Travelers argues that the subcontracts "included commissioning work," but it provides block quotations of the subcontracts that make no explicit reference to the term or to any form of testing.[64] Travelers also cursorily cites to documents called "Section 25 00 00 (Integrated Automation)," and "Section 25 08 00 (Commissioning of Integrated Automation)."[65] The latter document enumerates "contractor responsibilities," including "[d]emonstrate system operation" and "[m]anipulate systems and equipment to facilitate testing."[66]

Although Section 25 08 00 sheds some light on the commissioning process, Travelers has failed to explain what this document is and how it relates to the subcontracts. Travelers refers to this section as a "specification," which indicates that it is part of CCSD's project specifications. Indeed, a portion of the subcontracts that Travelers quotes refers to FAST furnishing its work in accordance with the "Manufacturer Specifications . . . ."[67] It therefore appears that the subcontract may incorporate these specifications by reference. Nonetheless, it improper to make multiple logical leaps in favor of the *moving* party at summary judgment. On this record, I cannot find as a matter of law that Fidelity was bound to the requirements of Section 25 08 00.[68]

---

[64] *E.g.*, ECF No. 327 at 5–6.

[65] ECF No. 328-7 at 6–37.

[66] ECF No. 328-7 at 29.

[67] ECF No. 327 at 5. Travelers also asserts that the term "'Subcontract Documents' was defined in the Subcontracts as including the Prime Contract and specifications," ECF No. 327 at 6, but the provision Travelers appears to be referencing makes no direct reference to any form of specifications. ECF No. 327 at 4.

[68] Travelers contends that McConnico, FAST's former CEO, acknowledged during his deposition that FAST's scope of work included commissioning. But his testimony is unclear. McConnico testified that commissioning was part of FAST's process "[a]s long as we're on the

14

But even if Travelers did establish the link between the subcontracts and

Section 25 08 00, it has failed to provide sufficient facts to demonstrate that Fidelity breached its

obligations.  Travelers merely cites to the fact that Fidelity's team of subcontractors left the job

sites without completing the commissioning process after Perini issued its notice of substantial

completion in May 2012.  It is unclear what steps Travelers expected Fidelity to take at that

point.  Indeed, other subcontractors were working on different aspects of the projects, and

Travelers has argued that FAST (and thereby Fidelity) was only "responsible for the

commissioning process associated with FAST's own work."[69]  But was Travelers therefore

required to maintain a holding pattern until all work by all subcontractors was completed at the

five schools?  Travelers's bare-bones arguments on this point provide no insight, and I therefore

cannot conclude as a matter of law that Fidelity breached its duties under the subcontracts or

performance bonds in relation to the commissioning process.

Accordingly, I grant Travelers's motion in part as to FAST's failure to meet the project

deadlines, but I deny the motion as to Fidelity's alleged failure to complete the commissioning

process.  I therefore need not—and do not—address the performance-bond and warranty arguments

related to commissioning.

---

[69] job to do it."  ECF No. 328-7 at 4.  He also answered affirmatively the question of whether he
testified earlier that Section 25 00 00 was "a portion of the specification that *related* to FAST's
scope of work on" one of the five elementary schools.  *Id*. (emphasis added).  His use of the term
"related" is ambiguous, especially given that Travelers did not provide an excerpt of the earlier
deposition testimony referenced.

[69] ECF No. 346 at 14.

## II. Even if the project delays attributable to FAST ran concurrent to Big Town's own delays, Travelers may still seek reimbursement for the resulting damages because FAST failed to request time extensions under the subcontracts.

Travelers's reimbursement claim is largely premised on its contention that the liquidated damages that CCSD assessed—and that Travelers paid in settlement—resulted from FAST's delays during the HVAC projects.[70]  In support, Travelers obtained a report from Jeff Ottesen, a schedule-delay expert who opined that over $2.7 million in delay damages were attributable to FAST.[71]  Fidelity moves for a determination that Travelers cannot establish that FAST caused any of these damages.  It asserts that the delays cited in the Ottesen report ran concurrent to delays that Big Town caused, and therefore, FAST was not the "but for" cause of the liquidated damages.[72]  Travelers counters with its own expert, Philip Spinelli,[73] who criticizes the Ottesen report's methodology and concludes that Ottesen's own findings reveal concurrent delays.[74]  This battle of the experts alone precludes summary judgment,[75] and I would normally conclude

---

[70] ECF No. 318 ¶ 34.

[71] ECF No. 291-1 at 1, 11.

[72] ECF No. 287 at 9–13; *see also R.P. Wallace, Inc. v. United States*, 63 Fed. Cl. 402, 410 (2004); *Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1232–33 (10th Cir. 1999) (explaining Critical Path Methodology); 5 Philip L. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor on Construction Law* § 15:67 (2018) ("Because the party seeking damages for delay must prove that delay to the critical path would not have occurred 'but for' an event within the 'control' of the other party, proof of a concurrent cause of delay outside of the other party's 'control' precludes recovery of damages.").

[73] Travelers argues that Spinelli is not qualified to opine on Ottesen's methodology because he lacks certain certifications.  ECF No. 314 at 16.  But Travelers has not moved to exclude Spinelli's report and proposed testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), or its progeny.

[74] ECF No. 291-3.

[75] Likely recognizing this defect in its own motion, Fidelity argues that Ottesen confirmed the existence of concurrent delays during his deposition.  Ottesen did testify that there were concurrent delays—a factor that he contends he compensated for in his analysis—but he does not appear to conclude that *all* the delays were concurrent.  ECF No. 291-2 at 7–8.  Because it

my analysis at this point.  But Travelers contends that FAST's failure to comply with the

subcontracts' time-extension provisions bars Fidelity from relying on a concurrent-delay

defense.  So, in the interest of paring down the issues remaining for trial, I will address this

argument.[76]

Travelers asserts that, "[w]here a subcontractor fails to comply with mandatory

subcontract procedures pertaining to requesting an extension of the subcontract time, the

subcontractor is responsible for all delay damages and loses the right to assert that others caused

the delay."[77]  In support, Travelers primarily cites to the California Court of Appeal's decision in

*Greg Opinski Construction, Inc. v. City of Oakdale*.[78]  There, the contractor was more than seven

months late on a project and failed to seek an extension under its contract with the city

government.[79]  The contract allowed for written requests for extensions of time if the delay was

caused by forces "beyond the control of the Contractor," including "acts of neglect by Owner,"

i.e., the city.[80]  The contractor was found liable at trial for liquated damages and argued on

appeal that such damages were precluded for "any portion of the delay that" the city had

---

remains possible that some (or even most) of the delays are solely attributable to FAST,
Ottesen's ambiguous concession does not resolve the material dispute of fact.

[76] Travelers raises several evidentiary objections to Fidelity's motion that are without merit.
ECF No. 314 at 8–12.  For instance, it objects to the Spinelli report as hearsay.  But at summary
judgment, it is the admissibility of the evidence's *content* rather than its form that is important.
*Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).  The purpose of an expert report is to
provide the opposing party notice of what the expert would testify to at trial, along with the facts
and data relied upon.  *See* FED. R. CIV. PRO. 26(a)(2)(B).  Further, Travelers's objections to
Fidelity's copies of the subcontracts largely overlap with the substantive question of which
agreements (the subcontracts or addendums) govern.

[77] ECF No. 314 at 19.

[78] *Greg Opinski Constr., Inc. v. City of Oakdale*, 132 Cal. Rptr. 3d 170 (Cal. Ct. App. 2011).

[79] *Id*. at 172.

[80] *Id*. at 173–74.

caused.[81]  The court held that, because the contractor failed to comply with the time-extension provision, it made "no difference whether [the contractor's] timely performance was possible or impossible . . . ."[82]  It reasoned that the purpose of these provisions "is to allocate to the contractor the risk of delay costs—even for delays beyond the contractor's control—unless the contractor follows the required procedures for notifying the owner of its intent to claim a right to an extension."[83]

Fidelity offers no contrary authorities in response.  It merely argues that, unlike in *Opinski*, which involved an owner-contractor relationship, Travelers's claim stems from a contractor-subcontractor relationship, in which "multiple subcontractors could be responsible for the delay."[84]  But given that Fidelity has attributed FAST's delays only to Big Town, this is a distinction without a difference.  Indeed, the subcontracts here allowed FAST to seek an extension for delays that CCSD *or* Big Town caused.[85]  And as discussed above, the subcontracts emphasized that seeking an extension was FAST's "exclusive remedy" in the event of such a delay and that a failure to request one would "act as a waiver of that claim."[86]  As in *Opinski*, this provision was clearly intended to allocate the risk of delay costs.  I thus agree that a defaulting party's failure to request an extension of time through the procedures specified in these

---

[81] *Id*. at 176.

[82] *Id*. at 178.

[83] *Id*.

[84] ECF No. 323 at 15.

[85] *E.g.*, ECF No. 288-2 at 6.  The subcontracts refer to "higher-tiered" parties, which they elsewhere define as "the Owner, the Tenant, the Prime Contractor and any higher-tiered subcontractor . . . ."  *Id*. at 3.

[86] *Id*. at 7.

subcontracts precludes that party from asserting that a delay caused by the owner or prime contractor prevented it from rendering timely performance.

Fidelity nonetheless raises several reasons why this rule should not apply to the circumstances of this case. It first argues that it is not bound by the time-extension provisions because they are part of the Big Town-FAST subcontracts, which Fidelity contends do not apply to itself or its team of subcontractors.[87] But this position ignores the fact that Fidelity took over performance from FAST once it defaulted on these subcontracts and thus stands in FAST's shoes.[88]

Fidelity similarly contends that compliance with the extension provisions was impossible because, once CCSD declared Big Town in default as the prime contractor, the subcontracts were terminated.[89] But even if I accept this legal premise, it does account for the fact that Big Town's default occurred approximately a year-and-a-half after Big Town had fired FAST and a year after Fidelity's team declared their work complete. Big Town's default may have contributed to the overall project delay, but this fact does not speak to FAST's delays or any delays that Fidelity's

---

[87] ECF No. 323 at 6. Fidelity also asserts that the addendums—which do not contain the same time-extension provisions—govern the Big Town-FAST relationship. Fidelity proffers the same evidence it does in opposition to Travelers's motion on breach, and I reject this argument for the same reasons.

[88] *Emp'rs Mut. Cas. Co. v. United Fire & Cas. Co*., 682 N.W.2d 452, 457 (Iowa Ct. App. 2004); *Caron v. Andrew*, 284 P.2d 544, 549 (Cal. 1955); *see also* ECF No. 310 ¶ 56 (Fidelity alleging in its complaint that it "completed the FAST subcontracts and is therefore also 'in the shoes' of FAST in making its bond claim").

[89] ECF No. 323 at 13; *see also C. C. Smith Co. v. Frankini Const. Co*., 135 N.E.2d 924, 927 (Mass. 1956) (stating that a subcontractor's "right to work on the project was derived from its subcontract with [the owner] and when the general contract was terminated it had no standing to perform further, in the absence of a new contract between it and [the owner]"); 2 Philip L. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor on Construction Law* § 5:265 (2018).

team caused or exacerbated. And Fidelity overlooks the fact that Big Town's default resulted in an assignment of its rights to Travelers under the GAI.

Finally, Fidelity makes several related arguments that it also raised in opposition to Travelers's motion: (1) that Perini did comply with the time-extension provisions until Big Town purportedly instructed it to stop submitting such requests; (2) that Big Town failed to keep a project schedule—as evidenced by its statement that the schedule was "dead" since August 2011; and (3) that Big Town refused to provide Fidelity and Perini the past project schedules. These arguments suffer from the same infirmities discussed above. Accordingly, I deny Fidelity's motion and decline to find that Travelers is barred from seeking delay damages.

## III.     Fidelity's remaining defenses are without merit.

Fidelity's "final motion for partial summary judgment" raises three defenses to Travelers's counterclaims. First, Fidelity argues that Travelers engaged in various forms of misconduct once Fidelity and its team took over performance and that the balance of equities thus prevents Travelers from pursuing its equitable-subrogation and assignment claims. Fidelity separately contends that Travelers cannot maintain its claim for breach of the performance bond because Travelers was the first to breach Fidelity's bond. Finally, Fidelity invokes the *Spearin* doctrine, contending that the HVAC-controller specifications that Fidelity was required to follow were defective and thus preclude Fidelity's liability. Many of these arguments implicate a question central to this litigation: what went wrong with the HVAC automation systems that so many contractors and subcontractors attempted to install? I will first address the parties' evidence on this point and then turn to Fidelity's arguments.

## A. Improper controllers *and* wiring prevented the HVAC automation systems from functioning correctly.

The first report describing the technical problems plaguing the HVAC systems appears to be the MEP report issued by the consulting firm that Travelers engaged after taking over for Big Town.[90] The report is short and comprised primarily of technical jargon and references to the project specifications. What is clear is that report blamed the HVAC issues, at least in part, on the "building controllers" installed at the five schools. Fidelity explains that "controllers are mini computers that essentially control air heating and cooling" and fall into the categories of Variable Air Volume (VAV) controllers and Roof Top Unit (RTU) controllers.[91] Specification Section 25 00 00 for the projects listed six pre-approved controller brands, along with approved installers.[92] FAST was approved as the installer for Honeywell-brand controllers, which it installed as the VAV controllers at all five schools and as the RTU controllers at two of these schools.[93] Another subcontractor installed Johnson-brand RTU controllers at the three remaining schools.[94]

The MEP report was specifically critical of the Honeywell and Johnson RTU controllers.[95] It opined that these controllers had "programming limitations" that caused a component referred to as the "JACE" to "lock[] up," which causes the "entire system to go[]"

---

[90] *See* ECF No. 330-7.

[91] ECF No. 329 at 3–4.

[92] *E.g.*, ECF No. 333 at 82.

[93] ECF No. 330 at 82; ECF No. 333 at 6.

[94] ECF No. 333 at 7.

[95] ECF No. 330-7 at 41.

down."[96]  Although this report is often a focal point of the parties' arguments, it provides little insight to the HVAC layperson.  Fortunately, Travelers commissioned a separate expert report (the Hammond report) that fills in many of the gaps.[97]

The Hammond report explains that one of the project specifications required the controllers to include a stand-alone capability.[98]  This means that, if a controller does not receive instructions from an external device, it will default to a preset heating and cooling mode designed for a school building filled with students and staff.[99]  This is a redundancy feature that ensures that buildings will be heated or cooled appropriately even if CCSD's remote servers or the onsite "supervisory devices" lose power or become inoperative.[100]  One of these supervisory devices is the aforementioned JACE, which communicates with CCSD's servers and the local controllers at each school.[101]  According to the Hammond report, Travelers's contractor Sletten discovered that some of the Honeywell controllers that FAST installed did not have stand-alone capacity.[102]  Consequently, if the JACE became overburdened and failed, the controllers were incapable of operating autonomously and the HVAC systems would not function.[103]

Beyond the problem with the controllers themselves, the Hammond report also concludes that FAST used "sub-standard" wiring when installing the controllers.[104]  This wiring did not

---

[96] *Id.*

[97] *See* ECF No. 261-1.

[98] *Id.* at 7; *see also* ECF No. 330-7 at 41.

[99] ECF No. 261-1 at 5–7.

[100] *Id.* at 7–9.

[101] *Id.* at 8.

[102] *Id.* at 12–13.

[103] *Id.* at 10–11.

[104] *Id.* at 14–16.

satisfy the project specifications and affected the controllers' warranty. [105]  The report further explains that the wiring issue distorts the HVAC automation system's communications "and leads to system malfunction."[106]  Citing to findings from a commissioning agency that tested one of the school's systems, the report stated that this improper wiring was "a critical reason the JACE was locking up" and that "the system would never function properly" unless the entire school was re-wired.[107]

Based on these issues, Sletten and its subcontractor ultimately replaced the controllers at all five schools with a different brand.[108]  And "irrespective of the controllers utilized, the Sletten team had to re-wire all" the controllers at the five schools.[109]

### B.    I cannot conclude on summary judgment that equity tilts in Fidelity's favor.

Travelers's counterclaim for reimbursement is premised on its contention that FAST and Fidelity breached the subcontracts and Fidelty's performance bonds.[110]  But because Travelers was not a party to either set of agreements, it relies on two legal principles that could allow it to obtain relief against Fidelity: equitable subrogation, and the assignment under the GAI of Big Town's contractual rights.  "Equitable subrogation permits a party who has been required to satisfy the loss created by a party's wrongful act to 'stand in the shoes' of the injured party and

---

[105] *Id*. at 15.

[106] *Id*. at 14.

[107] *Id*.

[108] *See* ECF No. 329 at 18.  The parties dispute whether the evidence demonstrates that Travelers and Sletten decided to replace the controllers based solely on the MEP report or after considering several factors, including the wiring issues.  ECF No. 335 at 14–15; ECF No. 344 at 5–7.  But even if Travelers made the *initial* decision to replace the controllers without being aware of the wiring issues, it is undisputed that Travelers eventually determined that rewiring the schools was critical to ensuring that the HVAC systems functioned correctly.

[109] ECF No. 261-2 at 16.

[110] ECF No. 335 at 17.

pursue the wrongdoer."[111]  In the construction context, a surety that steps in and performs a

contractor's obligations is subrogated "to the position of the contractor-principal" and "may

pursue the principal's claims and defenses" against subcontractors, the obligee, or other

parties.[112]

Fidelity argues that Travelers engaged in several misdeeds after Fidelity's team took over

for FAST and that equity therefore precludes Travelers from standing in Big Town's shoes under

subrogation or assignment.  It similarly claims that Travelers unreasonably delayed in acting on

its assignment after Big Town's default and that the equitable defense of laches therefore applies.

But there's a foundational problem with Fidelity's argument.  Fidelity has not established

that a breach-of-contract claim premised on a contractual assignment is subject to equitable

defenses.[113]  Although subrogation and assignment operate similarly from the surety's

perspective, the former is an equitable remedy (and thus subject to equitable defenses),[114] while

the latter sounds in contract.[115]  Because Fidelity carries the burden of establishing that it is

---

[111] *Gulf Ins. Co. v. TIG Ins. Co.*, 103 Cal. Rptr. 2d 305, 312 (Cal. Ct. App. 2001).

[112] 4A Philip L. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor on Construction Law* § 12:100 (2018).

[113] Fidelity cites only to a federal district-court decision from Kentucky addressing a surety's suit against a subcontractor under equitable subrogation and assignment.  *Nat'l Sur. Corp. v. Allen-Codell Co.*, 70 F. Supp. 189, 191 (E.D. Ky. 1947).  Without further elaboration, the court vaguely stated "[t]he fact that the [surety] took from . . . the principal contractor[] an assignment of his rights under his subcontract with the [subcontractor] seems to add nothing to the [equitable-subrogation] rights here asserted."  *Id.*  This vague conclusion is insufficient to assume a bridge between law and equity under Nevada law.

[114] *Am. Sterling Bank v. Johnny Mgmt. LV, Inc.*, 245 P.3d 535, 538 (Nev. 2010); *Nat'l Sur. Corp.*, 70 F. Supp. at 192–93.

[115] 4A Philip L. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor on Construction Law* § 12:100 (2018) ("Although the right of subrogation sometimes has been described as an 'equitable assignment' or 'assignment by operation of law,' the equitable right of subrogation is clearly distinct from contractual assignment . . . ."); *see also Wyler Summit P'ship v. Turner*

entitled to summary judgment and to any equitable defense, this deficiency defeats its assignment argument. I will therefore address only equitable subrogation.[116]

A subrogation claim requires courts "to balance the equities based on the facts and circumstances of each particular case."[117] A surety claiming the remedy must "establish that its equitable position is superior to the position of the party to be charged."[118] In arguing that equity tilts against Travelers, Fidelity asserts the following: (1) once Perini took over for FAST, Big Town provided it "disorganized, incomplete records or failed to give records altogether"; (2) Big Town breached the subcontracts by refusing to pay Perini for its work; and (3) after CCSD declared Big Town in default, Travelers waited nine months before informing Fidelity that it believed that Fidelity's team had failed to complete their work.[119] But these arguments reveal that summary judgment is improper on this defense. Whether Big Town breached the subcontracts through nonpayment is a question key to Fidelity's primary claim against Travelers and has yet to be resolved in this litigation. And, as discussed in more detail below, Fidelity has not demonstrated that it was entitled to notice that its team of subcontractors failed to complete the HVAC projects.

---

*Broad. Sys., Inc.*, 235 F.3d 1184, 1193 (9th Cir. 2000) (distinguishing between claims at law and equity).

[116] Because Fidelity's laches defense was tied only to its assignment argument, I will not address this issue.

[117] *Am. Sterling Bank*, 245 P.3d at 538. Citing to *Federal Insurance Co. v. Toiyabe Supply Co.*, Travelers contends that the Nevada Supreme Court has "disapprove[d] of the 'weighing of the equities' doctrine . . . ." 409 P.2d 623, 627 (Nev. 1966). But this assertion appears limited to the peculiar facts of this hoary case, especially given that Nevada's high court has approved of the doctrine in a far more recent and comparable case. *See Am. Sterling Bank*, 245 P.3d at 538.

[118] *Dobbas v. Vitas*, 119 Cal. Rptr. 3d 798, 800 (Cal. Ct. App. 2011).

[119] ECF No. 239 at 23–25.

Turning to Fidelity's side of the scale, it argues that it acted in good faith and believed that its subcontractors had completed their work when Perini issued the notice of substantial competition in May 2012. The undisputed evidence reveals, however, that Perini, by April 2012, was aware that FAST had used improper wiring.[120] Perini never redressed this issue, and neither it nor Fidelity informed Big Town or Travelers of the substandard wiring. On this record, I cannot conclude that Travelers holds an equitable position inferior or even equal to Fidelity.

One final note on equity. Throughout its motions, Fidelity has argued that Travelers is estopped from asserting that Fidelity's team did not complete FAST's scope of work.[121] Fidelity highlights the fact that Big Town never objected after Perini issued the notice of substantial completion. Fidelity also advances evidence that a Big Town representative stated at the time that Perini (and thus Fidelity) had completed work on the five schools.[122] But to warrant equitable estoppel, Fidelity must establish, among other things, that it was "ignorant of the true state of facts . . . ."[123] Because it undisputed that Fidelity's subcontractor knew that the HVAC systems were improperly wired, I find that Fidelity is not entitled to this estoppel defense.

## C. Travelers's delay in notifying Fidelity that its work was incomplete did not breach Fidelity's performance bond.

Fidelity argues that "an obligee to a performance bond materially breaches the performance bond if the obligee takes an action that deprives the surety of its ability to protect itself or control costs under the performance bond, regardless of whether any actual prejudice is

---

[120] ECF No. 335 9–10 (citing ECF No. 331-10); *see also* ECF No. 261-1 at 16. Fidelity never addresses Travelers's assertions or evidence on this point, which I interpret as a tacit concession.

[121] ECF No. 329 at 22–23; ECF No. 333 at 27–28.

[122] ECF No. 333 at 15.

[123] *Cheqer, Inc. v. Painters & Decorators Joint Comm., Inc.*, 655 P.2d 996, 999 (Nev. 1982).

caused to the surety."[124]  In support, Fidelity relies primarily on *Dragon, Inc. v. Parkway Bank &*
*Trust*, where the Illinois Appellate Court determined that an obligee breached the performance
bond by failing to give the surety notice before firing the bonded contractor and hiring a
replacement.[125]  The bond required the obligee to provide seven-day written notice before doing
so in order to "allow [the surety] to exercise its right under the performance bond to participate
in the selection of a successor contractor."[126]  Because the obligee acted unilaterally, the surety
"was stripped of its contractual right to minimize its liability under the performance bond by
ensuring that the lowest responsible bidder was selected to complete the job."[127]

These facts bear little resemblance to this case.  Big Town immediately notified Fidelity
that it had fired FAST and did not prevent the surety from attempting to complete FAST's work
(and minimize costs) by hiring its own subcontractors.  *Dragon* does not support the proposition
that Travelers was obligated to notify Fidelity that it had failed to remedy the HVAC problems
and to give Fidelity a second bite of the apple.  Nor can Fidelity point to a provision in the bond
that would grant it this right.  Accordingly, Travelers's decision to hire its own contractor rather
than immediately contact Fidelity did not breach the performance bond.

---

[124] ECF No. 329 at 28.

[125] *Dragon., Inc. v. Parkway Bank & Tr.*, 678 N.E.2d 55, 58 (Ill. App. Ct. 1997).

[126] *Id.*

[127] *Id.*

**D.     Because FAST failed to properly wire the HVAC controllers, Fidelity cannot rely on the *Spearin* doctrine.**

The *Spearin* doctrine recognizes the owner's implied warranty of the adequacy of a project's plans and specifications.[128]  Although the doctrine originated in federal contract law,[129] most jurisdictions, including Nevada, have adopted the rule that

> where a contractor has followed the plans and specifications furnished by the owner and his architect, he will not be responsible to the owner, at least after the work is completed, *for any loss or damage* [*that*] *results solely from the defects or insufficient plans or specifications, in the absence of any negligence* on the part of the contractor or any express warranty by him as to their being sufficient or free from defects.[130]

Fidelity argues that it is undisputed that the Honeywell HVAC controllers were the reason the HVAC automation systems failed to function correctly.  And because the project specifications required FAST to install these specific controllers, Fidelity contends that it cannot be held liable for the resulting delay damages.  But as discussed above, the undisputed evidence also establishes that FAST used improper wiring and thus failed to install the controllers properly. This mistake was not trivial, but rather was "a critical reason" the system was malfunctioning.[131] Fidelity therefore cannot demonstrate that the controllers were the sole cause of the system problems and resulting damages.  Accordingly, the *Spearin* doctrine does not shield Fidelity from liability.

---

[128] 3 Philip L. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor on Construction Law* § 9:81 (2018).

[129] *United States v. Spearin*, 248 U.S. 132 (1918).

[130] *Home Furniture, Inc. v. Brunzell Const. Co.*, 440 P.2d 398, 401 (Nev. 1968) (emphasis added); *see also Halcrow, Inc. v. Eighth Jud. Dist. Ct.*, 302 P.3d 1148, 1154 n.3 (Nev. 2013).

[131] ECF No. 261-1 at 14.

**Conclusion**

IT IS THEREFORE ORDERED that Travelers's motion for partial summary judgment **[ECF No. 327] is GRANTED in part and DENIED in part.** Summary judgment is granted on the narrow issues that the subcontracts signed on August 30, 2010, govern, and FAST breached these subcontracts by missing the project-completion dates. But summary judgment is denied as to Travelers's claim that Fidelity subsequently breached the subcontracts and performance bonds by not completing the commissioning process.

IT IS FURTHER ORDERED that Fidelity's motion for partial summary judgment on reimbursement-related damages **[ECF No. 287] is DENIED.**

IT IS FURTHER ORDERED that Fidelity's final motion for partial summary judgment **[ECF No. 329] is DENIED.**

IT IS FURTHER ORDERED that this case is REFERRED to a magistrate judge for a MANDATORY SETTLEMENT CONFERENCE. The parties' obligation to file their joint pretrial order is **STAYED until 10 days after that settlement conference.**

Dated: September 21, 2018

_____

U.S. District Judge Jennifer A. Dorsey